**FILED**

NOV 2 6 2007   NK

*Nov 26 2007*

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IFC CREDIT CORPORATION,       )
an Illinois corporation,              )
                                              )
                    Plaintiff,            )
                                              )       07CV 6627
v.                                           )       JUDGE ANDERSEN
                                              )       MAGISTRATE JUDGE NOLAN
MANUFACTURERS' LEASE PLANS, INC.,   )
                                              )
                    Defendant.         )

### NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that Defendant MANUFACTURERS' LEASE

PLANS, INC. hereby removes to this Court the state court action described below.

1.       On October 24, 2007, an action was commenced in the Circuit Court of

Cook County, Illinois, Municipal Department, Second District, entitled IFC Credit

Corporation, an Illinois corporation, Plaintiff, vs. Manufacturers' Lease Plans, Inc.,

Defendant, Case number 07 M2 002560.

2.       Defendant was served with summons on or about October 31, 2007, and

received a copy of Plaintiff's Complaint on or about October 31, 2007. This Notice is

timely.

3.       A copy of all process, pleadings and orders served upon Defendant in the

State Court action are attached hereto as Exhibit A.

4.       This action is a civil action of which this Court has original jurisdiction

under 28 U.S.C. §1332, and is one which may be removed to this Court by Defendant

pursuant to the provisions of 28 U.S.C. §1441(b) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs because the Plaintiff and Defendant are citizens of different States and although the Complaint alleges damages of $27,408.34, demand was made upon Defendant for $138,414.40 as evidenced by Plaintiff's letter dated October 4, 2007, a copy of which is attached hereto as Exhibit B.

5.    IFC CREDIT CORPORATION, an Illinois corporation, was, and still is, a corporation doing business in the State of Illinois.  Defendant, MANUFACTURERS' LEASE PLANS, INC., an Arizona corporation, was, at the time of the filing of this action, and still is a corporation doing business in Arizona.

**WHEREFORE**, Defendant, MANUFACTURERS' LEASE PLANS, INC., prays that this action be removed to the United States District Court for the Northern District of Illinois, Eastern Division.

DATED: November 26, 2007

                                        MANUFACTURERS' LEASE PLANS, INC.

By:    _____
                                        Patricia E. Rademacher
                                        COSTON & RADEMACHER
                                        105 W. Adams, Suite 1400
                                        Chicago, IL  60603
                                        Telephone:  (312) 205-1005

W:\6931 Manufacturers Lease Plans, Inc\18257 IFC Credit Corporation\Pleadings\Notice-Removal.Federal.doc

## CERTIFICATION

Pursuant to 28 USC§ 1446(a), Patricia E. Rademacher has read the Notice of Removal, that to the best of her knowledge, based on a reasonable investigation, this Notice of Removal is well grounded in fact and warranted by law; and that it is not interposed for any improper purpose, such as to harras or to cause unnecessary delay or needless increase in the cost of litigation.

_____

Patricia E. Rademacher

Subscribed and Sworn to before me
this 26TH day of NOVEMBER , 2007.

_____
Notary Public

```
----- OFFICIAL SEAL
      EDWARD P. GOLITKO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-10-2008
```

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, SECOND DISTRICT

IFC CREDIT CORPORATION,                  )
an Illinois corporation,                 )      Case No. **07M2002560**
                                         )
                          Plaintiff,     )      Amount Demanded: $27,408.34
                                         )      plus Costs and interest
      v.                                 )
                                         )      Return Date: 11/27/07
MANUFACTURERS' LEASE PLANS, INC.         )
                                         )      Status Date: 12/19/07
                          Defendant.     )      Courtroom: 204
                                         )      Time: 9:00 AM
                                         )

## VERIFIED COMPLAINT

NOW COMES the Plaintiff, IFC CREDIT CORPORATION ("IFC"), by and through one

of its attorneys, Beth Anne Alcantar, and for its Verified Complaint against defendant

Manufacturers' Lease Plans, Inc. states as follows:

## FACTS APPLICABLE TO EACH COUNT - THE PARTIES

1.      IFC is an Illinois corporation that maintains its principal place of business at 8700

Waukegan Road, Suite 100, in Morton Grove, Illinois.

2.      On information and belief, Manufacturers' Lease Plans, Inc. is an Arizona corporation

with its last known place of business at 818 East Osborn Road, Suite 200, Phoenix, AZ 85014.

## FACTS APPLICABLE TO EACH COUNT - JURISDICTION AND VENUE

3.      Manufacturers' Lease Plans, Inc. has contractually consented to the jurisdiction and venue

of any state or federal court situated in Cook County, Illinois pursuant to paragraph 11.1(A) of

the Master Sale and Assignment Agreement (defined below in Count I).



## COUNT I
## BREACH OF CONTRACT BY MANUFACTURERS' LEASE PLANS, INC.

4.    On or about December 30, 2004, Manufacturers' Lease Plans, Inc. entered into a Master Sale and Assignment Agreement (the "Master Agreement") with IFC CREDIT CORPORATION, pursuant to which it was sold and assigned certain rights under certain equipment leases more particularly described therein (the "Leases"). A copy of the Master Agreement is attached and incorporated as **"Exhibit A."**

5.    Manufacturers' Lease Plans, Inc. agreed pursuant to Paragraph 11.1 of the Master Agreement that

**IT SUBMITS ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT ANY OTHER DOCUMENT, OR FOR THE RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND ANY FEDERAL DISTRICT IN ILLINOIS.** [Emphasis in original.]

6.    On or about December 30, 2004, Manufacturers' Lease Plans, Inc. entered into a Servicing and Residual Agreement (the "Servicing Agreement") with IFC CREDIT CORPORATION that obligated IFC to provide services with respect to the equipment leases it had just sold to Manufacturers' Lease Plans, Inc. by way of the Master Agreement. A copy of the Servicing Agreement is attached and incorporated as **"Exhibit B."**

7.    Paragraph A on the first page of the Servicing Agreement reads, in relevant part, "All terms of the Master Sale and Assignment are incorporated herein."

8.    The Servicing Agreement is governed by the same jurisdiction clause as the Master Agreement, due to its incorporation into the Servicing Agreement.

9.    Paragraph 11 "Fourth" of the Servicing Agreement obligates Manufacturers' Lease Plans, Inc. to make consecutive monthly payments to IFC as follows:

... Fourth – <u>A</u>, in the case of all Transactions, (excluding those Transactions where either Composite or Royster are the Lessee, which are described below) the balance thereof, if any, to Assignee and to Assignor as follows:

To Assignee: (1) 100% of such amount as is equal to 10% of original equipment cost for each item of Equipment (plus taxes and 50% of late charges thereon); (2) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 20% of original equipment cost (plus 50% of the taxes and late charges thereon); and
(3) 10% of such amount in excess of such 20% of original equipment cost;

To Assignor:
(1) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 20% of original equipment cost; and
(2) 90% of such amount in excess of such 20% of original equipment cost;

Fourth – <u>B</u>, in the case of all Transactions where Composite is the Lessee, the balance thereof, if any, to Assignee and to Assignor as follows:

To Assignor:
(1) 100% of such amount as is equal to 10% of original equipment cost for each item of Equipment; and
(2) 90% of such amount in excess of 20% of original equipment cost;

To Assignee:
(1) 100% of such amount in excess of 10% of original equipment cost but not less than or equal to 20% of original equipment cost; and
(2) 10% of such amount in excess of such 20% of original equipment cost,

Fourth – <u>C</u>, in the case of all Transactions where Royster is the Lessee, the balance thereof, if any, to Assignee and to Assignor as follows:

To Assignee:
(1) 100% of such amount as is equal to 10% of original equipment cost for each item of Equipment;
(2) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 25% of original equipment cost; and
(3) 10% of such amount in excess of such 25% of original equipment cost;

To Assignor:
(1) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 25% of original equipment cost; and
(2) 90% of such amount in excess of such 25% of original equipment cost...

10.     The Servicing Agreement obligates Manufacturers' Lease Plans, Inc. to make payments to IFC pursuant to that formula after it has first collected payments from lessees of the assigned leases.

11.     On information and belief, as confirmed by Manufacturers' Lease Plans, Inc., Manufacturers' Lease Plans, Inc. has, in fact, received payments from lessees for the months of July, August and September and October.

12.     Nevertheless, Manufacturers' Lease Plans, Inc. has failed to make payments for the months of July, August and September and October.

13.     IFC has made demand upon Manufacturers' Lease Plans, Inc. for the servicing payments past due and owing under the Servicing Agreement, but Manufacturers' Lease Plans, Inc. has failed and/or refused to pay.

14.     According to the spreadsheet, attached hereto and incorporated as "**Exhibit C**", IFC is entitled to recover from Manufacturers' Lease Plans, Inc. an amount equal to $27,408.34 for the months of July, August, September, and October, in accordance with the terms of the Servicing Agreement.

15.     IFC has demanded that Manufacturers' Lease Plans, Inc. satisfy the indebtedness of Manufacturers' Lease Plans, Inc. under the Servicing Agreement, but Manufacturers' Lease Plans, Inc. has failed and/or refused to do so.

16.     After applying all just credits and deductions, there is presently due and owing to IFC the amount of not less than $27,408.34.

17.     Each month that Manufacturers' Lease Plans, Inc. does not pay IFC, after collecting from the lessee, the damages IFC incurred by IFC will increase. According to Exhibit C, in that scenario, IFC will be damaged by $7,767.00 for nonpayment in November, $9,768.08 for

nonpayment in December, $13,980.60 each month for nonpayment in January, February, and March, 2008, and $48,529.18 for nonpayment in April, 2008.

18. Accordingly, IFC seeks to recover from Manufacturer's Lease Plans, Inc. for all nonpayments that will have occurred prior to the date judgment is entered.

19. The obligation of Manufacturers' Lease Plans, Inc. to pay to IFC is based on a written contract. Accordingly, IFC is entitled to recover prejudgment interest at the rate provided by law.

WHEREFORE, IFC CREDIT CORPORATION respectfully requests that this Court enter judgment in its favor and against defendant Manufacturers' Lease Plans, Inc., as follows:

a) Awarding IFC damages in the principal amount of not less than $27,408.34, which sum shall include monthly obligations as set forth hereinabove from July, 2007, until the date of judgment is entered, together with interest thereon, from the date of default, until such sum is paid in full;

b) Awarding IFC its court costs incurred in enforcing its rights under the Servicing Agreement; and

c) Awarding IFC such other and further relief as this Court deems just and reasonable.

Respectfully submitted,

IFC CREDIT CORPORATION

By: _____
One of Its Attorneys

IFC CREDIT CORPORATION
Beth Anne Alcantar No.: 33780
Attorney for Plaintiff, IFC Credit Corporation
8700 Waukegan, Suite 100
Morton Grove, Illinois 60053
847-663-6700

## CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned, Robert Polonsky of IFC Credit Corporation, certifies that the statements set forth in the foregoing instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that the undersigned verily believes them to be true.

Robert Polonsky

Beth Anne Alcantar, Cook County Attorney Number 33780
Attorney for Plaintiff, IFC Credit Corporation
8700 Waukegan Road, Suite 100
Morton Grove, IL 60053
(847) 663-6700

## MASTER SALE AND ASSIGNMENT AGREEMENT

This Master Sale and Assignment Agreement ( "Agreement") is made as of December 30, 2004 between Manufacturers' Lease Plans, Inc., as the "Assignee" and IFC Credit Corporation, as the "Assignor".

### RECITALS:

WHEREAS, Assignor is a company engaged in equipment leasing;

WHEREAS, Assignor has, from time to time entered into leases, including schedules ("Lease Schedules") under a master lease agreement (a "Master Lease Agreement"; a lease or a Lease Schedule together with a Master Lease Agreement, a "Lease" or "Lease Agreement") between Assignor as lessor ("Lessor") and the party named in the Lease as lessee ("Lessee") pursuant to which Assignor leases the equipment ("Equipment") described in such Lease Agreement to Lessee (the Leases forming the subject matter of this Agreement being sometimes each referrred to as a "Transaction" and collectively referred to as the "Transactions");

WHEREAS, the parties have agreed that the Assignee will purchase from the Assignor, all right, title, and interest of Assignor in and to the Assigned Property (as defined in Section 1.1 below); and

WHEREAS, Assignee desires that Assignor continue to administer the Lease Agreements after this Assignment;

NOW THEREFORE, in consideration of the mutual covenants contained herein, the parties hereby covenant and agree as follows:

### ARTICLE 1
### PURCHASE AND SALE

1.1    Conveyance. The Assignor has agreed to sell, transfer and assign to the Assignee and the Assignee has agreed to purchase from the Assignor, all right, title, and interest of Assignor in and to (i) the Lease Agreements identified as Exhibit A (sometimes herein referred to as the "Purchase Schedule")and all associated rights and interests, including, without limitation, all rental payments, prepayments and other amounts payable by the Lessee to Assignor under each Lease Agreement ("Lease Payments") and the right to receive and retain all such amounts; (ii) the Equipment described in the Lease Agreements; (iii) all proceeds from the Equipment and warranties and insurance covering the Equipment; (iv) the remedies and rights that are available to Assignor, as Lessor under the Lease Agreements, including, but not limited to, the right of the Assignor to enforce payment of any or all amounts and to compel performance by Lessee of Lessee's obligations under the Lease Agreements; (v) all contracts of guaranty or surety, and collateral of any kind or nature to which Assignor has rights to in connection with the Lease Agreements; and (vi) all financing statements filed by Lessor to perfect Lessor's interest in the Equipment. The property, rights and interests described in subparts (i) through (vi) are herein

P:\IFC - portfolio\Master Sale  AG FINAL (01-21-05).doc

Master Sale and Assignm[...]

EXHIBIT

A

collectively referred to as the "Assigned Property." Each Lease Schedule representing all or any portion of the Assigned Property is considered chattel paper, as such term is defined in the Uniform Commercial Code of the applicable jurisdiction (the "Uniform Commercial Code"). This Agreement shall be considered a separate and enforceable agreement incorporating the terms and conditions of this Agreement and each sale and assignment shall be subject to the terms and conditions of this Agreement.

1.2    Absolute Sale.  Subject to the provisions of Section 3 hereof, Assignee shall have the right in its own behalf and in its own name to take any action under the Transactions, the Related Documents and the Assigned Property which Assignor might have taken, save for this Agreement. To the extent assignable and subject to the rights of the related Lessee under any Lease with respect thereto, Assignor hereby assigns to Assignee the benefits of all warranties, representations, covenants and indemnities, relating to the condition of the Equipment or title to the Equipment, made to Assignor by, or which Assignor is entitled to enforce against, any predecessor in title to the Equipment or the manufacturer or supplier of the Equipment.

1.3    Payment of Purchase Price.  The Purchase Price specified in the Purchase Schedule shall (subject to fulfillment of each of the conditions precedent set forth in Article 2 below) be paid by Assignee to Assignor on the dates agreed upon between the parties. The closing shall be deemed to have occurred upon the date (the "Closing Date") of Assignee's tender and Assignor's acceptance of payment of five percent (5%) or more of the Purchase Price; Provided, however, that Assignor shall retain a security interest, perfected by possession, of the Assigned Property pending payment of the balance of the Purchase Price.

1.4    ASSIGNOR AND ASSIGNEE INTEND THE PURCHASE HEREUNDER TO BE A PURCHASE BY ASSIGNEE AND AN ABSOLUTE AND UNCONDITIONAL SALE, ASSIGNMENT AND TRANSFER BY ASSIGNOR.   EXCEPT AS SPECIFICALLY PROVIDED HEREIN, PURCHASE IS WITHOUT RECOURSE TO ASSIGNOR, EXCEPT AS SPECIFICALLY PROVIDED HEREIN, AND THE ASSIGNOR WILL HAVE NO OTHER PERSONAL LIABILITY TO PAY ANY AMOUNTS DUE OR IN CONNECTION WITH ANY LEASE AGREEMENT.  To assure complete sale and assignment, Assignor hereby transfers, conveys, assigns and grants to Assignee a security interest in all of the following only to the extent that such relate to the Assigned Property, whether now owned or hereafter acquired or existing and wherever located: all accounts, chattel paper, general intangibles (including, without limitation, contract rights), deposit accounts, inventory and all books, invoices, documents and other records in any form evidencing or relating to any of the foregoing; substitutions and replacements for the foregoing, but only to the extent that such relate to the assigned property, and products or proceeds of the foregoing, but only to the extent that such relate to the assigned property.  (All of the above assets are defined pursuant to the provisions of Article 9 of the Uniform Commercial Code.)

1.5    Rights Under Master Lease Agreements.  If the Lease to be purchased by Assignee is an equipment schedule (each an "Equipment Schedule") to a Master Lease Agreement between Assignor and a particular Lessee (each a "Master Lease"), Assignee and Assignor hereby confirm that Assignor is selling and Assignee is buying of all of Assignor's right, title and interest in and to each such Equipment Schedule to the Master Lease which has

Master Sale and Assignment Agreement

been identified on the attached Purchase Schedule along with the Equipment described therein and the related rights applicable to such Equipment Schedule. Assignor acknowledges and confirms that it shall transfer and assign to Assignee all of Assignor's the right title and interest of Assignor under the related Master Lease insofar as, and only to the extent that, it relates to each such Equipment Schedule purchased by Assignee. Assignee and Assignor confirm that each such purchased Equipment Schedule and Assignor's rights under the related Master Lease insofar as, and only to the extent that the Master Lease relates to each such Equipment Schedule purchased by Assignee, are included in the meaning of the term "Lease".

1.6    Allocation of Revenues and Expenses.    All rentals, taxes and other amounts, accruing or due or payable with respect to any Transaction or the related Equipment prior to the Cut-off Date established on the Purchase Schedule shall be for the account of Assignor. All such amounts accruing or becoming due or payable with respect to any Transaction and the related Equipment on and subsequent to the Cut-off Date shall be for the account of Assignee.

# ARTICLE 2
## CONDITIONS OF EACH PURCHASE

2.1    Conditions to Assignee's Obligation.    The obligation of the Assignee to acquire the Assigned Property (each a "Purchase") contemplated in the Purchase Schedule and pay the Purchase Price shall be subject to fulfillment of each of the following conditions precedent (each of which may be waived in whole or in part by the Assignee):

(a)    the Assignee shall have approved the terms of the Lease Agreements and also approved the Lessee;

(b)    the representations and warranties contained in this Agreement shall be true as of the date each applicable Purchase is to be made, no monetary default exists under the Lease Agreement and, to the best of the Assignor's knowledge, no event of default or other default or event which, with the giving of notice or the lapse of time, or both, would constitute a default shall have occurred and be continuing hereunder or under the Lease Agreement;

(c)    the Assignee shall have received, unless otherwise agreed to by the Assignee, the following documents:

(i)    complete copies of the Master Lease Agreement and amendments of the Master Lease Agreement (if applicable) covering the applicable Equipment, executed by the Assignor and the Lessee (together with all applicable Lease Schedules, exhibits, riders and containing all required special markings or notations);

(ii)    a copy of the Lease Agreement, and the originally executed Lease Schedule or, if Lease is not pursuant to a Master Lease Agreement, the originally executed Lease;

(iii)    a complete executed certificate of acceptance covering the applicable Equipment;

PAFC - portfolios\Master Sale AG FINAL (01-21-05).doc

(iv)    a fully executed notice of assignment addressed to the applicable Lessee in a form and substance reasonably satisfactory to Assignee (the "Notice of Assignment");

(v)    proof of filing of appropriate UCC-1 financing statements or other perfection of security interest and the priority thereof;

(vi)    Uniform Commercial Code Financing Statement Assignments duly executed by Assignor designating Manufacturer's Lease Plans, Inc. as Assignee;

(vii)    copies of materials evidencing the purchase of and payment for the Equipment and for any other items financed, including but not limited to copies of checks, if available, invoices and bills of sale;

(viii)    such corporate documents as may be reasonably necessary in the judgment of the Assignee to verify the due authorizations and execution of all relevant documents by the Assignor and the Lessee;

(ix)    an invoice from Assignor for the amount of the Purchase Price for the Assigned Property; and

2.2    Conditions to Assignor's Obligations.    Assignor's obligation to assign any Assigned Property shall be expressly conditioned upon execution and delivery by both parties of this Agreement, the concurrent Servicing and Residual Agreement and payment of the Purchase Price.

# ARTICLE 3
## ASSIGNOR REPRESENTATIONS

3.1    Transactional Representations and Warranties.    Assignor hereby represents and warrants to Assignee, as of the date hereof and as of any Closing Date hereunder with respect to any sale, assignment and transfer of Assigned Property acquired or to be acquired by Assignee from Assignor hereunder that:

(a)    Assignor (i) is a corporation duly organized, validly existing, and in good standing under the State of Illinois; (ii) has all requisite corporate power and authority to own or lease and operate its properties and carry on its business as now conducted and as proposed to be conducted and to execute, deliver and perform under this Agreement, and (iii) is duly qualified or licensed to do business as a foreign corporation and is in good standing in every jurisdiction where the nature of its business requires it to be qualified or licensed and where failure to be so qualified in a particular jurisdiction would materially adversely affect Assignor's business or its obligations to perform hereunder, or Assignor's rights and interests in the Assigned Property;

(b)    the execution, delivery, and performance by Assignor of the Agreement and all other instruments and documents to be delivered by it hereunder including, but not limited to, the

P:\FC - portfolio\Master Sale  AG FINAL (01-21-05).doc

Master Sale and Assignment Agreement

Assigned Property (i) are within its corporate power, (ii) have been duly authorized by all necessary corporate action, (iii) do not violate or conflict with any provision of law or any material agreement or indenture by which it is bound or by which its properties may be affected in any material respect or of its certificate of incorporation or bylaws, and (iv) do not require on its part the filing with, notification to, or the consent or approval of any governmental body, agency or authority or any other person that has not been obtained;

(c)    there is no action, suit or proceeding pending against Assignor before or by any court, administrative agency or other governmental authority that calls into question the validity of, or might in any material way impair, the execution, delivery or performance by Assignor of this Agreement;

(d)    each of this Agreement and each Lease Agreement constitutes the legal, valid and binding obligation of Assignor, enforceable against Assignor in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity, regardless of whether such enforceability is considered in a proceeding in law or equity;

3.2    <u>Assigned Property Warranties and Representations</u>: As to each Item of the Assigned Property acquired or to be acquired by Assignee, Assignor does hereby represent and warrant to Assignee as of the date hereof and as of the respective Closing Date applicable to the Assigned Property acquired hereunder as follows:

(a)    Assignor has good title to the Assigned Property, free and clear of all liens, claims, demands, encumbrances, privileges, security interests, pledges or other charges of any parties claiming such lien or interest through Assignor or the related Lessee and subject only to the rights of the Lessee(s) under each Lease, except the rights of the Lessees under each of the Leases. Assignor has the right to sell, transfer and assign the Assigned Property (or the right to transfer or assign its security interest therein), and any sale, transfer or assignment to Assignee is and will be a valid and enforceable transfer of all of Assignor's right, title and interest in and to the Assigned Property;

(b)    Each Lease Agreement is in full force and effect and there exists no event of default under the Lease Agreement and no event has occurred which would, with the giving of notice or lapse of time, or both, constitute an event of default under the Lease Agreement, and the Assignor has not given any consents, approvals or waivers under or in respect of the Lease Agreement other than those previously disclosed in writing to the Assignee;

(c)    The unpaid balances of rentals and other payments due under each Lease, as set forth in the Purchase Schedule by Assignor, are true and correct in all respects (notwithstanding the foregoing, the Assignee shall provide Assignor with written notice of and an opportunity to cure any discrepancy); the Purchase Schedule contains an accurate statement of those Transactions with respect to which the Customers have made security deposits and the amount of such security deposits; and there has been no payment of any security deposit or prepayment of rent or any other Lease Payments, except as set out in the Purchase Schedule;

P:\IFC - portfolios\Master Sale AG FINAL (01-21-05).doc

Master Sale and Assignment Agreement

(d)     all covenants and obligations of any kind whatsoever on the Assignor's part to be performed under the Lease Agreement to the date of the applicable Purchase and, to the best of Assignor's knowledge, all covenants and obligations of any kind whatsoever on the part of any other person to be performed under the Lease Agreements to the date of the applicable Purchase including all conditions precedent to the obligation of the Lessee to pay rent to have been duly performed or fulfilled;

(e)     the applicable Equipment and/or other items under the Lease Agreement have been delivered, installed and accepted by the Lessee;

(f)     Assignor has not heretofore assigned, pledged, mortgaged, charged, granted a security interest in all or any part of its interest in the Assigned Property;

(g)     the Lease Agreement has not been amended, restated, canceled, extended or modified, except as specifically disclosed in the Purchase Schedule;

(h)     to the best of Assignor's knowledge, the Lease Agreement (i) has been duly and validly authorized, executed and delivered by the Lessee; (ii) is in full force and effect with respect to the Lessee; (iii) constitutes the legal, valid and binding obligations of the Lessee, enforceable against such party in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and by applicable laws and judicial decisions which may affect the remedies provided therein; and (iv) no Lessee under the Transactions has protested or disputed its obligations under its Lease or indicated to Assignor that it intends to withhold performance under its Lease;

(i)     the Lease Schedules are the original documents, and the certificates of acceptance and all credit enhancement documents (if any) supplied by the Assignor to the Assignee in connection with this transaction are the original documents or true and correct copies of original documents;

(j)     the Master Lease Agreement supplied by the Assignor to the Assignee and all other documents are true and correct copies of the original documents;

(k)     the sale of the Lease Agreement shall not relieve Assignor from, or cause Assignee to be liable for, the obligations of Assignor arising under the Lease on or before the date of assignment;

(l)     No Transaction being sold (or to be sold) by Assignor and being purchased (or to be purchased) by Assignee is in default of any of its material terms, conditions or provisions, or, except as otherwise disclosed to Assignee, is past due in the payment of any scheduled payment and there is no action, suit, or proceeding pending against Assignor before or by any court, administrative agency or other governmental authority which does or might bring into question the validity of, or in any way impair the execution, delivery or performance by Assignor of any obligation of Assignor hereunder or under any Transaction;

Master Sale and Assignment Agreement

(m)     Except as otherwise disclosed, the Assignor has filed UCC financing statements against the Customers in order to provide notice of Assignor's ownership of the Equipment, and such financing statements have not been terminated, released or assigned (except as contemplated by this Agreement). Other than financing statements or other similar instruments of registration under the law of any jurisdiction which (A) will be released or assigned to the Assignee, or (B) will be filed pursuant hereto in order to evidence Assignee's ownership of the Equipment or to perfect the interest of the Assignee in the Transactions and Equipment, there are no other financing statements or instruments on file, and the Assignor has not and will not execute or authorize any financing statement or similar instrument, under the laws of any jurisdiction relating to the Assignor's interest in the Transactions or Equipment;

(n)     Assignor has good title to any guaranties made by third parties, pledges of additional collateral by any Customer or third parties, or other documentation relating to the promise of any Customer to perform the obligations evidenced thereof;

(o)     All sales, use, property or other taxes, licenses, tolls or other fees, bonds, permits or certificates which were (or may be) required to be paid or obtained, as the case may be in connection with Assignor's original acquisition of the Equipment from the manufacturer, or the creation or existence of any lien of the manufacturer or otherwise relating to or affecting the Equipment or each Transaction have been (or when due will promptly be) paid in full (or adequate provision for such payment has or shall have been made, whether hereunder or otherwise) or obtained, as the case may be. Assignor agrees to indemnify Assignee for taxes, fees or similar charges that arise or are attributable to the sale and assignment to Assignee or attributable to any period prior to and including the applicable Closing Date to the extent not payable by each Customer pursuant to each Transaction;

(p)     Assignor shall indemnify and defend the Assignee's title to the Transactions and the Assignee's title (or, the Assignee's security interest) acquired hereunder in the related Equipment against all claims and demands of all persons at any time claiming by or through the Assignor;

(q)     The Assignor will have caused all copies of all files related to each Transaction in its possession to be separately identified and distinguished from the Assignor's other leases by an appropriate legend clearly disclosing the fact that such Transaction and the related Equipment have been transferred to the Assignee and any original copies of any documents relating to such Transaction subsequently coming into the possession of the Assignor will be delivered to the Assignee;

(r)     Neither the Assignor nor, to the Assignor's knowledge, the Customer has done or failed to do anything that would or might permit any such Customer or the Assignor to terminate such Transaction or suspend or reduce any payments or obligations due or to become due thereunder by reason of default by the other party to such Transaction. The Assignor has duly fulfilled all obligations on its part to be fulfilled under or in connection with such Transaction and has done nothing to impair the rights of the Assignee in such Transaction or payments with respect thereto or the related Equipment. Assignor acknowledges to Assignee that: (a) there are no additional agreements between the Assignor and Lessee or Borrower, as applicable, relating to

P:\FC - portfolios\Master Sale  AG FINAL (01-21-05).doc                        Master Sale and Assignment Agreement

the Equipment; (b) the Transaction is in full force and effect; (c) the Equipment currently is in the Customer's possession and control at the location(s) detailed in the Lease; and (d) it will deliver copies of all notices and other communications given to or made by Customer pursuant to the Transaction, to Assignee; (e) it will not enter into any agreement amending, modifying or terminating the foregoing Transaction without the prior written consent of Assignee; (f) and through the Closing Date applicable to each Transaction, all insurance coverages required to be obtained by the Customer under the Transaction have been obtained and are in full force and effect;

(s)     No Transaction has been amended, altered or modified in any respect and no provision of such Transaction has been waived, except, in each case, in writing, and copies of all such writings will be attached to the Transaction when delivered to Assignee. The Customer has not been released, in whole or in part, from any of its obligations in respect of such Transaction; such Transaction has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and no Equipment covered by such Transaction has been released from such Transaction, in whole or in part; and no instrument has been executed that would effect any such satisfaction, release, cancellation, subordination or rescission; and

(t)     Assignor has not failed to disclose any material adverse information or fact as to any Transaction, Equipment or Customer to Assignee which is known to Assignor and which, if disclosed to Assignee in the reasonable opinion of Assignee would cause Assignee to alter its decision to purchase the Assigned Property.

(u)     Assignor represents and warrants, except as disclosed in the column of the Purchase Schedule "New/Used," all of the Equipment under each Lease was new equipment at the inception of the lease; that the Equipment under each Lease was first placed in service on the Lease Start Date on the Purchase Schedule and that the current lessee of the Equipment is the initial Lessee and user of the Equipment. Assignor acknowledges that it understands the materiality of this representation, its material bearing upon the Purchase Price Assignee has agreed to pay and its material bearing on Assignee's willingness to go forward with the purchase contemplated by this Agreement. Assignor will, accordingly, indemnify Assignee from any loss, damage or liability resulting from the failure of the warranties in this paragraph 3.2(u).

## ARTICLE 4
## ASSIGNEE REPRESENTATIONS

4.1     The Assignee hereby represents and warrants to the Assignor and reaffirms such representations and warranties as at the time of each Purchase that:

(a)     Assignee (i) is a corporation duly organized, validly existing, and in good standing under the laws of Arizona (ii) has all requisite organizational power and authority to carry on its business as now conducted and as proposed to be conducted and to execute, deliver and perform this Agreement and any other instruments or documents required hereunder, and (iii) is duly qualified or licensed to do business and is in good standing in every jurisdiction where the nature of its business requires it to be qualified or licensed in order to purchase and hold the Assigned

Property, and otherwise perform its obligations, hereunder and where failure to so qualify would have a material adverse effect on Assignee's business or its obligations to perform hereunder;

(b)     The execution, delivery and performance by Assignee of the Agreement and all other instruments and documents to be delivered by it hereunder including, but not limited to the Servicing and Residual Agreement (i) are within its organizational power, (ii) have been duly authorized by all necessary corporate action, (iii) do not violate or conflict with, in any material respect, any provision of law or any material agreement or indenture by which it is bound or by which it properties may be affected or its organizational documents, and (iv) do not require on its part the filing with, notification to, or the consent or approval of any governmental body, agency or authority or any other person which has not been obtained; and this Agreement and the Servicing and Residual Agreement constitutes the legal, valid and binding obligation of Assignee, enforceable against it in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and general principles of equity, regardless of whether such enforceability is considered in a proceeding in law or equity;

(c)     Assignee has independently and without reliance upon Assignor conducted its own credit evaluation, reviewed such information as it has deemed adequate and appropriate and made its own analysis of the Lease Agreement;

(d)     Assignee has not relied upon any investigation or analysis conducted by, advice or communication from, nor any warranty or representation by Assignor or any agent or employee of Assignor, express or implied, concerning the financial condition of Lessee or any collateral provided pursuant to the Master Lease Agreement, or the tax or economic benefits of any purchase of the Assigned Property;

(e)     Assignee has had (or acknowledges by its execution of any applicable Purchase Schedule, that Assignee will prior thereto have had) access to all financial and other information that it deems necessary to evaluate the merits and risks of an investment in the Lease Agreement(s) including the opportunity to ask questions, receive answers, and obtain additional information from Assignor and the Lessee necessary to verify the accuracy of information provided.    Assignee acknowledges that Assignor takes no responsibility for any financial information regarding the Lessee furnished to Assignee by Assignor; and

(f)     Assignee or its authorized representatives acting on its behalf have such knowledge and experience in business and financial matters necessary to evaluate the merits and risks of an investment in the Lease Agreement. Assignee further represents that it is experienced in making investments in lease transactions similar to the Lease Agreement and that it is financially able to undertake the risks involved in such an investment.

(g)     Assignee is not "insolvent" or a "debtor" as defined in the Federal Banruptcy Code.

**ARTICLE 5**
**COVENANTS**

Page 9 of 18

Assignor hereby agrees that, with respect to any Assigned Property assigned to Assignee hereunder:

(a)    Assignor will not without the written consent of the Assignee, waive, excuse, condone, forgive, amend or in any manner release or discharge the Lessee thereunder of or from the obligations, covenants, conditions and agreements to be performed by the Lessee, in any way;

(b)    Assignor will appear in and defend every action or proceeding arising out of a breach by Assignor of its obligations, duties or liabilities under the Lease Agreement at the Assignor's cost and expense;

(c)    Assignor will forthwith notify the Assignee of any default affecting the Assignee's interest under the Lease Agreement upon receipt of such information;

(d)    that the Assignor shall forthwith advise the Assignee of any notice which it receives from a Lessee that Assignor reasonably believes could create or result in a default under the Lease Agreement; and

(e)    Assignor shall advise Assignee of any loss or damage to any Equipment of which it has knowledge.

The provisions in this Article will survive the termination of the whole or any part of this Agreement and the transactions contemplated hereunder.

## ARTICLE 6
## INDEMNITY

6.1    <u>Indemnification.</u>  Each party ("Indemnitor") hereby agrees to indemnify, protect and hold the other ("Indemnitee") harmless against and from any and all third-party losses, costs, damages, injuries, expenses, loss of the benefits, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, reasonable attorneys' and other professionals' fees, court costs and disbursements, but excluding lost profits and general overhead) (collectively, "Losses") which may be imposed upon, incurred by, or awarded against Indemnitee and arising from (i) any Event of Default (as defined in Section 7.1 or 7.2 below) and (ii) any of the losses which relate to the Lease Agreement during the period of time that it was/is the Indemnitor's obligation under such Lease Agreement.  Notwithstanding the foregoing, Indemnitor shall not be obligated to indemnify Indemnitee against any Losses incurred by Indemnitee to the extent caused by Indemnitee's negligence or willful misconduct.

6.2    <u>Other Remedies.</u>  In addition to all of its other rights and remedies under this Agreement, each party may exercise any other rights and remedies available at law or in equity. Any party may proceed by appropriate court action at law or in equity to enforce performance by the other party of the applicable covenants of this Agreement. IN NO EVENT SHALL ANY PARTY BE LIABLE FOR LOSS OF PROFITS OR INDIRECT, SPECIAL OR

Master Sale and Assignment Agreement

CONSEQUENTIAL DAMAGES, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

6.3    The terms of this Article will survive the termination of the whole or any part of this Agreement and the transactions contemplated hereunder.

## ARTICLE 7
### EVENTS OF DEFAULT

7.1    <u>Default by Assignor</u>.  The Assignor will be in default under this Agreement upon the occurrence of any of the following events (each an "Assignor Event of Default"):

(a)    A breach by the Assignor in any of its obligations, covenants and liabilities provided under this Agreement, provided the Assignor receives written notice of default and the Assignor does not cure such default within five (5) days of receipt of such notice in the case of a monetary default and within thirty (30) days of receipt of such notice in the case of a non-monetary default;

(b)    If any warranty or representation made or furnished to the Assignee by the Assignor under or in respect of this Agreement proves to have been false or incorrect in any material respect when made or furnished; and

(c)    In the event that the Assignor files a voluntary bankruptcy petition, ceases to do business as a going concern, or makes any assignment for the benefit of its creditors, or a custodian, receiver, trustee, liquidator, administrator or person with similar powers shall be appointed for Assignor or for a substantial part of its property, or Assignor has any of its properties seized or attached, or takes any action to authorize, or for the purpose of effectuating the foregoing; provided however, that Assignor shall have a period of sixty (60) days within which to discharge any involuntary petition for bankruptcy or similar proceeding(any such event, an "Assignor Insolvency Event").

7.2    <u>Default by Assignee</u>.  The Assignee will be in default under this Agreement upon the occurrence of any of the following events (each an "Assignee Event of Default"):

(a)    A breach by the Assignee in any of its obligations, covenants and liabilities provided under this Agreement, provided the Assignee receives written notice of default and the Assignee does not cure such default within five (5) days of receipt of such notice;

(b)    if any warranty or representation made or furnished to the Assignor by the Assignee under or in respect of this Agreement proves to have been false or incorrect in any material respect when made or furnished; and

(c)    In the event that the Assignee files a voluntary bankruptcy petition, ceases to do business as a going concern, or makes any assignment for the benefit of its creditors, or a custodian, receiver, trustee, liquidator, administrator or person with similar powers shall be appointed for Assignee or for a substantial part of its property, or Assignee has any of its

Master Sale and Assignment Agreement

P:\IFC - portfolios\Master Sale  AG FINAL (01-21-05).doc

properties seized or attached, or takes any action to authorize, or for the purpose of effectuating the foregoing; provided however, that Assignee shall have a period of sixty (60) days within which to discharge any involuntary petition for bankruptcy or similar proceeding(any such event, an "Assignee Insolvency Event").

**ARTICLE 8**
**REMEDIES**

8.1     Upon an Assignor or Assignee Event of Default, and while such default is continuing, the non-defaulting party will have the right to terminate this Agreement on giving ten (10) days written notice. Notwithstanding any termination by the non-defaulting party hereunder, such termination shall not prejudice the rights of the non-defaulting party for monies due and owing to it or to enforce rights that continue after the termination of this Agreement.

8.2     Recourse to Assignor.  In addition to the matters indemnified by Assignor to Assignee hereunder, the Transactions are being sold to Assignee hereunder with recourse to Assignor solely for the following circumstances: For each Transaction that is thirty (30) days or more past due as of the Closing Date, Assignor shall, upon the demand of Assignee, which shall be made within thirty (30) days of the Closing Date, repurchase the affected Transaction and any rights held by Assignee in the related Equipment from the Assignee for an amount equal to the actual amount of any advance or investment made by Assignee to Assignor with respect to the affected Transaction plus eight percent (8%) per annum interest (the "Repurchase Price") thereon from the Closing Date related to such Transaction through the date that the payment is made to Assignee. Such payment shall be received by Assignee on or before the fifth (5th) Business Day following the date of Assignee's demand.   Additionally, for each Transaction where an insolvency proceeding (voluntary or involuntary), was commenced prior to the closing date with respect such Transaction and such Transaction was less than thirty (30) days past due as of the Closing Date,  the Assignor shall upon the demand of Assignee, which shall be made within thirty (30) days of the Closing Date, repurchase the affected Transaction and any rights held by Assignee in the related Equipment from the Assignee for an amount equal to the Repurchase Price free an clear of all liens and encumbrances arising by or through Assignee. Such payment shall be received by Assignee on or before the fifth Business Day following the date of Assignee's demand. Upon receipt of such payment by Assignee, Assignee shall transfer the affected Transaction to the Assignor free and clear of all liens, encumbrances and adverse claims created hereunder or by the Assignee.

8.3     If the Assignee, Assignor or any of its assigns discovers that any original document related to a Transaction is defective (that is, not an original, mutilated, damaged, defaced, incomplete, improperly dated, clearly forged or otherwise altered) in any material respect, the party discovering such defect shall immediately notify the other party, whereupon the Assignor shall have thirty (30) days to cure or cause such defect to be cured. If any such defect has not been cured within such time period, the Assignee shall immediately notify the Assignor and the Assignor shall repurchase the related Transaction at the Repurchase Price within five Business Days after demand to repurchase is made by Assignee. The Assignor shall remit any such Repurchase Price to the Assignee or its designee.

8.4    The obligations of Assignor under paragraphs 8.2 and 8.3 above, are in addition to all other obligations of Assignor under this Agreement.

8.5    Notwithstanding anything herein contained to the contrary, it is understood and agreed that in the event there is an event of default by a Lessee under the Lease Agreement, the Assignee will have full recourse against the Lessee as contemplated under this Agreement. Upon such default, the Assignor and the Assignee agree that the Assignee will have no recourse against the Assignor.

8.6    The foregoing remedies are in addition to and not a limitation of either party's rights at law or in equity.

## ARTICLE 9
## QUIET POSSESSION BY LESSEE

9.1    So long as Lessee is not in default under the Lease Agreement, its right to the use of the applicable Equipment shall not be impaired by the Assignee.

## ARTICLE 10
## SERVICING OF LEASES

10.1    Services to be Provided.  In consideration of the residual commissions and other compensation provided for in the concurrently executed Servicing and Residual Agreement between Assignor and Assignee, Assignor shall provide the following services which shall include all invoicing, payment processing and remittance and accounting reports; all with respect to the Equipment Leases (including month-to-month rental arrangements) purchased hereunder by Assignee from Assignor (collectively, the "Accounts").

## ARTICLE 11
## GOVERNING LAW; SEVERABILITY

11.1    IN ORDER TO INDUCE ASSIGNEE TO ENTER INTO THIS AGREEMENT THE ASSIGNOR AND ASSIGNEE HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(A)    SUBMITS ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT ANY OTHER DOCUMENT, OR FOR THE RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND ANY FEDERAL DISTRICT IN ILLINOIS;

(B)    CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREINAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR

P:\FC - portfolio\Master Sale  AG FINAL (01-21-05).doc

Master Sale and Assignment Agreement

PROCEEDING IN ANY SUCH COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(C) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO THE OPPOSING PARTY AT ITS ADDRESS SET FORTH ON THE SIGNATURE PAGE HERETO OR AT SUCH OTHER ADDRESS OF WHICH IT SHALL HAVE NOTIFIED THE OTHER PARTY PURSUANT THERETO;

(D) AGREES NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW;

(E) AGREES THAT THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS (WITHOUT GIVING EFFECT TO CONFLICT OF LAW PROVISIONS) OF THE STATE OF ILLINOIS.

11.2   Any provision of this Agreement that is prohibited or not fully enforceable in a jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing any of the party's rights hereunder or under the remaining provisions of this agreement in such jurisdiction will not invalidate or render unenforceable in any respect any such provision in any other jurisdiction.

11.3   EACH OF ASSIGNOR AND THE ASSIGNEE HEREBY IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) OF ANY TYPE IN WHICH ASSIGNEE AND THE ASSIGNOR ARE PARTIES AS TO ALL MATTERS ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED IN CONNECTION HEREWITH.

## ARTICLE 12
## NOTICES

12.1   All notices, requests, demands and other communications provided for hereunder shall be in writing (including facsimile communication), unless expressly indicated to the contrary herein, and mailed, faxed or delivered to each party at the address set forth below each party's signature hereto or at such other address as each party may designate in a written notice to the other party, complying as to delivery with the terms of this Section. All such notices, requests, demands and other communications shall be effective when received (whether through the mails or by facsimile or delivery).

## ARTICLE 13
## FURTHER ASSURANCES

13.1    Each of the parties hereto shall, from time to time, at the other's request and expense and without further consideration, execute and deliver such other instruments of transfer, conveyance and assignment and take such further action as the other may require to complete more effectively any matter provide for herein.

## ARTICLE 14
### GENERAL

14.1    The provisions hereof shall inure to and be binding upon the parties hereto and their respective successors and assigns.

14.2    The headings used in this Agreement are for convenience only and are not to be considered a part of this Agreement and do not in any way limit or amplify the terms and provisions of this Agreement.

14.3    No modification, variation or amendment of any provisions of the Agreement shall be made except by a written agreement, executed by the parties hereto. No waiver will be effective unless in writing.

14.4    Where the context so requires, the singular number shall be read as if the plural were expressed and the provisions hereof shall be read with all grammatical changes necessary dependent upon the person referred to being a male or female.

14.5    Assignor and Assignee hereby acknowledge and agree that this Agreement, together with all Exhibits hereto and the Servicing and Residual Agreement represent the complete and final agreement between the parties with respect to the subject matter hereof, and shall supersede all prior written or oral statements, agreements or understandings between the parties relating to the assignment of Assigned Property.

14.6    This Agreement may be executed in any number of counterparts, which shall together constitute but one and the same agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

Assignee:
**MANUFACTURERS' LEASE PLANS, INC.**

By: _____

Title: _President_

Date: _December 30, 2004_

Address for notices:
818 East Osborn, Suite 200

Assignor:
**IFC CREDIT CORPORATION**

By: _Marc Tan_

Title: _Sr VP - Finance_

Date: _12/30/2004_

Address for notices:
8700 Waukegan Road, Suite 100

P:\IFC - portfolio\Master Sale AG FINAL (01-21-05).doc

Master Sale and Assignment Agreement

## SERVICING AND RESIDUAL AGREEMENT

A.    This Servicing and Residual Agreement relating to and within the meaning of the Master Sale and Assignment Agreement dated as of December 30, 2004 (the "Master Sale and Assignment Agreement") between IFC Credit Corporation ("Assignor") and Manufacturer's Lease Plans, Inc. (the "Assignee") is entered into as of December 30, 2004. All terms of the Master Sale and Assignment Agreement are incorporated herein. All capitalized terms used and not otherwise defined herein shall have the meaning set forth in the Master Sale and Assignment Agreement.

B.    As of the date of purchase of the Assigned Property the Assignee purchases from the Assignor and the Assignor hereby sells to the Assignee pursuant to the terms of the Master Sale and Assignment Agreement, all of the Assignor's right, title and interest in and to the Lease Agreements referred to in the Purchase Schedule to the Master Sale and Assignment Agreement.

C.    With respect to each of the Lease Agreements, the Assignor hereby reaffirms its representations and warranties contained in the Master Sale and Assignment Agreement. Without limitation of the foregoing, (i) there has been no prepayment of rent or any other moneys assigned hereby, except as disclosed in the Purchase Schedule to the Master Sale and Assignment Agreement; (ii) none of the Lease Agreements have been amended, extended or modified, except as disclosed in such Purchase Schedule and; (iii) no payment default exists under any the Lease Agreement.

D.    **Servicing; Services to be Provided.**    In consideration of the residual commissions and other compensation provided for in the concurrently executed Assignment Schedule between Assignor and Assignee, Assignor shall provide the following services which shall include all invoicing, payment processing and remittance and accounting reports; all with respect to the Equipment Leases (including month-to-month rental arrangements) purchased hereunder by Assignee from Assignor (collectively, the "Accounts").

The following supersedes Article 10, ("Servicing of Leases") of the parties' concurrent Master Sale and Assignment Agreement.

1.    **Assignment of Servicing Rights.**    Assignee hereby assigns to Assignor all rights, and delegates to Assignor all duties, to service the Leases, and Assignor hereby accepts such assignment and delegation, and agrees to service the Leases pursuant to the terms and conditions contained herein.

2.    **Servicing Standards.**    Assignor shall service and administer the Leases in accordance with Assignor's customary and usual procedures for servicing credit or lease agreements comparable to the Leases. Assignor shall invoice and collect the payments due under the Leases (by directing payments to the Lockbox Account, defined below, and otherwise acting to enforce overdue payments), set up a computer program for appropriate reporting of the Leases, maintain receivable balance and payment status information on the Leases, and do all

EXHIBIT
B
tabbies

other things it would customarily do, and employ the same level of care it would normally employ, in servicing the leases for its own account.

Assignor shall comply in all material respects with and service the Leases in accordance with the terms of the Leases and all applicable rules and regulations affecting the Leases, except in so far as any failure to so comply or perform would not materially and adversely affect Assignee's interest in the Leases. Assignor shall not be obligated to use separate servicing procedures, offices or employees for servicing the Leases from the procedures, offices or employees used by Assignor in connection with servicing other credit or lease agreements. Assignor may at any time delegate all or part of its duties hereunder to any person that agrees to conduct such duties in accordance with this Agreement. Such delegation shall not relieve Assignor of its obligations under this Agreement and shall not constitute a resignation by Assignor.

Assignor shall have full power and authority, acting alone or through any party properly designated by it under this Agreement, to do any and all things in connection with servicing and administering the Leases, which it may deem reasonably necessary or desirable. Assignee shall furnish Assignor with any documents in its possession reasonably necessary or appropriate to enable Assignor to carry out its servicing and administration duties hereunder.

Assignor shall advance all expenses incurred in connection with its servicing and administration activities under this Agreement, including all expenses relating to the enforcement of the Leases; provided, however, that Assignor shall not be required to advance any payments not made when due by any lessee under any Lease.

3.    **Lockbox Account.** Assignee shall establish an account (the "Lockbox Account") with Lakeside Bank to be used for the collection and remittance of payments under the Leases and which will provide for not less than weekly transfers of all collected balances (less sums due Assignor pursuant to Sections 4 and/or 7 below) to an account to be designated by Assignee. Assignee shall not use the Lockbox Account for any purpose other than the processing of payments under the Leases or otherwise on account of the Equipment. Assignor and Assignee shall both use their best efforts to direct all payments under the Leases or on account of the Equipment directly to the Lockbox Account, if, despite such efforts, Assignor or Assignee subsequently receives one or more payments under the Leases or on account of the Equipment other than through the Lockbox, Assignor or Assignee (as the case may be) shall promptly deposit (by the following fifth (5th) business day) such payments into the Lockbox Account. Assignor and Assignee shall mutually agree to the form and substance of any control/disbursement agreement for any Lockbox Account established pursuant to this Agreement.

4.    **Consideration to Assignor.**

(a)    In consideration of its servicing and administration activities under this Agreement, Assignor, as Agent, shall be entitled to fifty percent (50%) of all late charges, plus one hundred percent (100%) of the first $250.00 of any end-of-lease fees and termination fees paid by any lessee under any Lease, together with the residual

2

commissions provided for in Section 11, below. Payment of such compensation shall be on a monthly basis.

(b)    Provided Assignee has approved such expenditure, Assignor may also reimburse itself and third parties for all reasonable out-of-pocket costs, expenses and advances including but not limited to insurance, taxes, costs of collection and repossession, storage and liquidation, made or incurred by Assignor or such third parties in connection with Assignor's servicing and administration responsibilities under this Agreement. Assignor shall be reimbursed promptly after Assignee receives any invoice and supporting documents from Assignor describing in reasonable detail the costs and expenses for which Assignor is seeking reimbursement.

5.    **Restrictions.** Without Assignee's prior written consent, Assignor will not do any of the following:

(a)    make or consent to an extension, discount or other modification of the payment schedule under any Lease (except by permitting prepayments in full) or make or consent to any alteration in any of the other terms of any Lease or any collateral therefor or any documents relating to the foregoing or any item of equipment covered by any Lease;

(b)    make or consent to any release, substitution or exchange of any item of equipment covered by any Lease;

(c)    sell or re-lease any item of equipment covered by any Lease;

(d)    grant any waivers to or settle any claims against the customer under any Lease or any guarantor or any other obligor therefor; or

(e)    make any settlement with any insurance company with respect to loss or damage to any item of equipment covered by any Lease or with any other person with respect to a breach of warranty claim with respect to any item of equipment covered by any Lease.

6.    **Reports and Records.** Assignor, as servicing agent, shall provide such information to Assignee about the status of the Leases as Assignee may reasonably request from time to time, including:

(a)    On or before the 10th day of each calendar month (or if such day is not a business day, then on the next business day): a complete record of all payments due under the Leases as of the last day of the preceding month, including the amounts and customers for which payment is overdue and the period for which such amounts are overdue, substantially in a form mutually acceptable to Assignor and Assignee; and

(b)    At all reasonable times, access to all records, files, books of account, data bases and information pertaining to all items of Leases, payments thereunder and

3

equipment covered thereby, so that Assignee and its representatives may inspect, audit and make extracts therefrom at its own expense.

(c)    Assignor shall use commercially reasonable efforts to promptly notify Assignee of any account which becomes more than 35 days past due and of any instance in which Assignor receives notice that a Customer has filed for protection under the Bankruptcy Code or under any state or federal receivership laws or has made an assignment for the benefit of creditors or has taken other action of a similar nature under laws providing for the relief of debtors and to notify Assignee of any instance in which Assignor is notified or has other reason to believe that a Customer is withholding payment for cause or alleged cause.

7.    **Payments and Collections.**  Assignee will retain for its own account the periodic transfers from the Lockbox Account and all other payments and collections received under the Leases. Notwithstanding the foregoing, in the event a payment is made by a customer under any Lease directly to Assignee and not to the Lockbox Account, Assignor shall nevertheless be entitled to receive, and Assignee shall promptly remit to Assignor, fifty percent (50%) of all late charges, plus one hundred percent (100%) of the first $250.00 of any end-of-lease fees and termination fees paid by any lessee under any Lease and other amounts pursuant to Section 4 hereof. Assignee agrees that Assignor shall be under no obligation to advance any payments not made when due by customers under any Leases.

8.    **Limitation of Liability and Indemnification.**  Assignor shall be liable to Assignee only to the extent of the obligations specifically undertaken by Assignor in this Agreement in its capacity as servicing agent. Neither Assignor nor any of the directors, officers, employees or agents of Assignor shall have any liability to Assignee or to any other person for any damages, liability or losses (Collectively, "Liability") resulting from or relating to any action taken or for refraining from the taking of any action in good faith under this Agreement or from any customer under any Lease making any payment to any account other than the Lockbox Account; and Assignee agrees to indemnify Assignor and its directors, officers, employees and agents from and against any and all Liability resulting from an act or omission undertaken by Assignor at the specific request or direction of Assignee; provided, however, that this provision shall not protect Assignor or any such person against any liability which would otherwise be imposed on it, him or her for breach of this Agreement or for willful misconduct, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties under this Agreement. Assignor and any director, officer, employee or agent of Assignor may rely in good faith on any document of any kind that appears to be properly executed and submitted by Assignee or any third-party respecting any Leases arising under this Agreement.

9.    **Servicer Defaults.**  If any of the following events (each a "Servicer Default") shall occur and be continuing;

(a)    Any failure by Assignor to make any payment, transfer or deposit required by this Agreement on or before the date when due and such failure shall continue for

4

Nov-15-2006  02:40pm    From-WLPI                    6029444417        T-621  P.006/009   F-635

more than five (5) business days after Assignor either acknowledges such failure, in writing, or receives written notice of such failure from Assignee; or

(b)    The institution of any proceeding by Assignor or the adverse adjudication of proceedings instituted against Assignor under any bankruptcy or insolvency laws, the general assignment of Assignor's assets for the benefit of its creditors; or Assignor's acknowledgement, in writing, of its insolvency or of its inability to pay its debts as they mature;

(c)    Assignor fails to submit any other report to Assignee pursuant to this Agreement or knowingly and intentionally makes other material misrepresentation to Assignee or knowingly and intentionally withholds material information which it is required to disclose under the terms of this Agreement;

(d)    any failure on the part of Assignor duly to observe or perform in any material respect any of the other covenants or agreements of Assignor set forth in this Agreement which failure has a material adverse effect on Assignee's interests in the Leases and which continues unremedied for a period of 15 days after the date on which written notice of such failure shall have been given to Assignor by Assignee; then Assignee shall have the right to terminate this Agreement immediately and shall have all rights and remedies available to it under applicable law.

10.    **Termination.**  The Assignor's right to service the Leases may be terminated:

(a)    Assignor as to any Lease or Leases if, after consultation with Assignee and upon written notice of no less than 60 days, in Assignor's reasonable opinion, (i) Assignor is unable to effectively service the Lease or Leases and collect payments thereunder without undue expense, or (ii) Assignor reasonably determines that the Lease or Leases is/are uncollectible.

(b)    Assignor agrees that if a default by Assignor has occurred and is continuing for those periods hereinabove set forth, Assignee may, at its option, upon at least thirty (30) days written notice, during such notice period the Assignor may cure any such default and this servicing agreement shall continue in full force and effect, terminate Assignor's further performance under this servicing arrangement, without any further liability or obligation by Assignee except as Assignor's right to residual commission under Section 11 hereof.  Such right of termination shall be in addition to all other rights herein and those at equity or in law.

(c)    In the event an account is more than 35 days past due, Lessee or any Guarantor files for protection under the Bankruptcy Code or under any state or federal receivership or insolvency laws or has made an assignment for the benefit of creditors or has taken other action of a similar nature under laws providing for the relief of the debtors, Assignee may thereafter withdraw such account from this servicing arrangement, at any time.

5

11.    Residual.

Upon receipt of any remarketing proceeds, purchase prices, tax payments or tax reimbursement, casualty loss insurance proceeds or loss payments pursuant to a Transaction, payments made by a Lessee under a purchase option following an election to return the Equipment, and, following an event of default under a Transaction, any sale or liquidation proceeds or rental payments, Assignee and Assignor shall cooperate to effectuate the disbursal of amounts on deposit in the Lockbox Account in the following order of priority:

First, to the Assignee, so much of such amounts as is necessary to pay (or reimburse Assignee for) any sales or use tax paid or due and payable with respect to any Transaction or the related Equipment and advances for taxes, insurance and equipment protection made by the Assignee, collection and repossession costs incurred by Assignee; and any other expenses for which Assignor has been reimbursed by (or out of monies otherwise due) Assignee pursuant to Section 4(b), above;

Second, the balance thereof, if any, to Assignee, so much of such amount as is necessary to pay all unpaid committed rental payments, as set forth on the Purchase Schedule attached to the Master Sale and Assignment Agreement;

Third, to Assignor, so much of such amount as is necessary to pay 50% of all late charges, plus 100% of the first $250.00 of any end-of-lease fees and termination fees collected from a Lessee with the balance of any such late charges, end-of-lease fees and termination fees payable to Assignee;

Fourth – A, in the case of all Transactions, (excluding those Transactions where either Composite or Royster are the Lessee, which are described below) the balance thereof, if any, to Assignee and to Assignor as follows:

To Assignee: (1) 100% of such amount as is equal to 10% of original equipment cost for each item of Equipment (plus taxes and 50% of late charges thereon);
(2) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 20% of original equipment cost (plus 50% of the taxes and late charges thereon); and
(3) 10% of such amount in excess of such 20% of original equipment cost;

To Assignor:
(1) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 20% of original equipment cost; and
(2) 90% of such amount in excess of such 20% of original equipment cost;

6

Fourth – **B**, in the case of all Transactions where Composite is the Lessee, the balance thereof, if any, to Assignee and to Assignor as follows:

**To Assignor:**
(1) 100% of such amount as is equal to 10% of original equipment cost for each item of Equipment; and
(2) 90% of such amount in excess of 20% of original equipment cost;

**To Assignee:**
(1) 100% of such amount in excess of 10% of original equipment cost but less than or equal to 20% of original equipment cost; and
(2) 10% of such amount in excess of such 20% of original equipment cost,

Fourth – **C**, in the case of all Transactions where Royster is the Lessee, the balance thereof, if any, to Assignee and to Assignor as follows:

**To Assignee:**
(1) 100% of such amount as is equal to 10% of original equipment cost for each item of Equipment;
(2) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 25% of original equipment cost; and
(3) 10% of such amount in excess of such 25% of original equipment cost;

**To Assignor:**
(1) 50% of such amount in excess of 10% of original equipment cost but less than or equal to 25% of original equipment cost; and
(2) 90% of such amount in excess of such 25% of original equipment cost;

Fifth, the balance thereof, if any, to Assignee or its designees.

Upon receipt of any rental payments during the renewal term or extended term rentals payable under any Transaction following the initial term thereof, Assignor and Assignee shall cooperate in instructing the servicing agent to disburse further payments coming into the Lockbox Account on such Transaction in accordance with clauses Fourth and Fifth of this Section 11.

Except where the residual recovery on a Transaction is impaired by a continuing event of default or other material failure of the lessee to perform its contractual obligations under such Transaction and except in the case where Composite is the Lessee, if the residual recovery distributed or to be distributed under clause Fourth of this Section 11 for Equipment on a specific Transaction ("Transaction A") is less than 10% of original equipment cost ("Residual Deficiency"), the Assignor shall credit the Assignee a dollar amount equal to such Residual Deficiency from Assignor's share of those funds next received on other Transactions ("Transaction B") that have a residual return that exceeds 10% of original equipment cost in order to bring such residual return for Transaction A to an amount equal to 10% of Transaction A's original equipment cost. Such Residual Deficiency of Transaction A, however, shall not

7

reduce the residual recovery by Assignee on Transaction B and shall be deducted from Transaction B's proceeds only to the extent they would otherwise be paid over to Assignor under clause Fourth of this Section 11.   Residual Deficiency credits shall be addressed on a monthly basis.

In the case where Composite is the Lessee, except where the residual recovery on the Transaction is impaired by a continuing event of default or other material failure of the lessee to perform its contractual obligations under such Transaction, if the residual recovery distributed or to be distributed under clause Fourth of this Section 11 for Equipment on a specific Transaction ("Transaction A") is less than 20% of original equipment cost ("Residual Deficiency"), the Assignor shall credit the Assignee a dollar amount equal to such Residual Deficiency less 10% of the original equipment cost from Assignor's share of those funds next received on other Transactions ("Transaction B") that have a residual return that exceeds 10% of original equipment cost (or other Composite transactions that have any residual return) in order to bring Assignee's share of such residual return for Transaction A to an amount equal to 10% of Transaction A's original equipment cost.  Such Residual Deficiency of Transaction A, however, shall not reduce the residual recovery by Assignee on Transaction B and shall be deducted from Transaction B's proceeds only to the extent they would otherwise be paid over to Assignor under clause Fourth of this Section 11.  Residual Deficiency credits shall be addressed on a monthly basis.

IN WITNESS WHEREOF each of Assignee and Assignor have executed this Assignment Schedule by their duly authorized representatives on this 30th day of December, 2004.

Assignee:                                          Assignor:

MANUFACTURERS' LEASE PLANS, INC.      IFC CREDIT CORPORATION

By: _____            By: _____

Title: ___Presid nt____                Title: _Senior VP- Finance__

Date: _December 30, 2004__             Date: _Dec 30, 2004__

8

# ROYSTER-CLARK SHARING AGREEMENT

Original Cost $539,213.25
MLPI 100% of first 10% $53,921.32
MLPI 50% of next 15% $80,881.98 ÷ 2 = $40,440.99
MLPI 10% of any additional funds
Monthly payment 4/1/07 → 3/1/08 $15,534.00
Balloon payment 4/1/08 $53,921.32

| | MLPI | Sub-total | IFC | Sub-total | Total |
|---|---|---|---|---|---|
| 4/1/2007 | $15,534.00 | | | | |
| 5/1/2007 | $15,534.00 | | | | |
| 6/1/2007 | $15,534.00 | | | | |
| 7/1/2007(a) | $15,534.00 | | | | |
| 7/1/2007(b) | $7,319.32 | $53,921.32 | $4,107.34 | $53,921.32 | $53,921.32 |
| 8/1/2007 | $15,534.00 | | $7,767.00 | | |
| 9/1/2007 | $15,534.00 | | $7,767.00 | | |
| 10/1/2007 | $15,534.00 | | $7,767.00 | | |
| 11/1/2007 | $15,534.00 | | $7,767.00 | | |
| 12/1/07 (a) | $15,534.00 | $5,265.65 | $5,265.65 | | |
| 12/1/07 (b) | $500.27 | $40,440.99 | $4,502.43 | $40,440.99 | $80,881.98 |
| 1/1/2008 | $15,534.00 | | $13,980.60 | | |
| 2/2/2008 | $15,534.00 | | $13,980.60 | | |
| 3/1/2008 | $15,534.00 | | $13,980.60 | | |
| 4/1/2008 | $53,921.32 | $10,552.60 | $48,529.18 | $94,973.41 | $105,526.01 |
| TOTAL | $240,329.32 | $104,914.91 | $104,914.91 | $135,414.40 | $135,414.40   $240,329.31 |

*(handwritten)* $27,408.34

EXHIBIT C

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT - SECOND DISTRICT

| | | |
|---|---|---|
| IFC CREDIT CORPORATION, an<br>Illinois corporation. | ) | Case No. 07M2002560 |
| | ) | |
| | ) | Amount claimed:  $27,408.34 plus, costs |
| Plaintiff, | ) | and interest |
| | ) | |
| vs. | ) | Return Date: 11/27/07 |
| | ) | |
| MANUFACTURERS' LEASE PLANS, | ) | Status Date: 12/19/07 |
| INC. | ) | |
| | ) | |
| Defendant(s). | ) | Courtroom: 204 |
| | ) | Time: 9:00 AM |
| | ) | |
| | | Please serve:  See attached service list |

## SUMMONS

To each defendant:   YOU ARE SUMMONED and required:

1.     To file your written appearance by yourself or your attorney and pay the required fee in Room 136, Skokie Courthouse, 5600 Old Orchard Rd., Skokie, Illinois, 60077 at or before 9:00 a.m. on November 27             , 2007.

2.     To file your answer to the complaint in Room 136 at or before 9:00 a.m. on that date as required by Par. 4 in the notice to defendant below.

**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF IN THE COMPLAINT, A COPY OF WHICH IS ATTACHED.**

To the officer:   This summons must be returned by the officer or other person to whom it was given for service, with endorsement for service and fees, if any, immediately after service, and not less than three (3) days before the day for appearance.  If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than three (3) days before the day for appearance.

**THERE WILL BE A FEE TO FILE YOUR APPEARANCE. SEE FEES ON THE SECOND PAGE OF THIS FORM.**

Beth Anne Alcantar, Cook County Attorney
Number 33780
Attorney for Plaintiff, IFC Credit Corporation
8700 Waukegan Road, Suite 100
Morton Grove, IL 60053
(847) 663-6700

WITNESS: 10 - 24 - 2007

Dorothy Brown
Clerk of Court

Date of Service: _____, 20 ____
To be inserted by officer on copy left with
Defendant or other person)

## NOTICE TO PLAINTIFF

*Not less than 14 or more than 40 days after issuance of summons if amount claimed is $5,000 or less; not less than 21 or more than 40 days after issuance of summons if amount claimed is in excess of $5,000.

## NOTICE TO DEFENDANT

1. This case will not be heard on the day for appearance specified above. If you filed your written appearance or answer, you need not appear in person on that day.
2. If the complaint is notarized, your answer must be notarized.
3. If you are sued for $5,000 or less you need not file an answer unless ordered to do so by the court. You must file your appearance on o8r before the return date specified above.
4. If you are sued for more than $5,000 you have 10 days from the return date to answer or otherwise plea. You must file your appearance on or before the return date specified above.
5. On the day for appearance specified above, the following will occur:
   a. If Plaintiff is not present, the case may be dismissed for want of prosecution.
   b. If you have not filed an appearance, or you have filed an appearance and are not present, the Plaintiff may obtain an ex parte default judgment against you for the amount claimed.
   c. If you have filed an appearance and are present on Status/Trial Day, trial may be held that day, or may be set for another day certain.

**APPEARANCE FEES INCLUDE A COUNTY LAW LIBRARY FEE OF $13.00, THE COURT AUTOMATION FEE OF $15.00, A DOCUMENT STORAGE FEE OF $15.00 AND THE MANDATORY ARBITRATION FEE OF $10.00 WHERE APPLICABLE.**

**APPEARANCE FEES (BASED ON THE AMOUNT OF CLAIM)**
**(ALL CASES; NO DISPUTE RESOLUTION CHARGED)**

| | |
|---|---|
| **FORCIBLE DETAINER (POSSESSION ONLY)** | **$133.00** |
| **$1500 OR LESS** | **$133.00** |
| **$1500 TO $15,000.00** | **$143.00** |
| **MORE THAN $15,000.00** | **$163.00** |

**JURY FEES ARE AS FOLLOWS:**

**CLAIMS FOR DAMAGES NOT IN EXCESS OF $10,000.00**

| | |
|---|---|
| *SIX-PERSON | $12.50 |
| *TWELVE-PERSON JURY | $25.00 or |

$12.50 if another party paid for a jury of six

**CLAIMS FOR DAMAGES NOT IN EXCESS OF $15,000.00**

| | |
|---|---|
| *SIX-PERSON | $115.00 |
| *TWELVE-PERSON JURY | $230.00 or |

$115.00 if another party paid for a jury of six

**CLAIMS FOR DAMAGES IN EXCESS OF $15,000.00**

| | |
|---|---|
| *TWELVE-PERSON JURY | $230.00 |

**\*THESE FEES MAY BE WAIVED BY APPROPRIATE COURT ORDER. YOU HAVE THE RIGHT TO FILE A PETITION SEEKING SUCH AN ORDER.**

## Service List

1.      Manufacturers' Lease Plans, Inc.
818 East Osborn Rd.
Suite 200
Phoenix, AZ 85014



CREDIT CORPORATION

October 4, 2007                                              John R. Zinke Jr.
                                                    Attorney, Vice President - Legal Affairs

**Via FedEx, Fax to 602-944-4417, and**
**E-Mail to Roger Marce [rmarce@leaseplans.com]**
Roger R. Marce, President
Manufacturers' Lease Plans, Inc.
818 East Osborn Rd., Ste. 200
Phoenix, AZ   85014

RE:    **MLPI-IFC Royster-Clark – Residual Sharing**
       **Ref. Master Sale and Assignment Agreement &**
       **Servicing and Residual Agreement between MLPI and IFC,**
       **both dated December 30, 2004**

Dear Mr. Marce:

In connection with the issues raised in our telephone conversation of the other day, we have again reviewed the Master Sale and Assignment Agreement and the Servicing and Residual Agreement between Manufacturers' Lease Plans, Inc., ("MLPI"), and IFC Credit Corporation, ("IFC"), both dated December 30, 2004. You indicated that you feel IFC should offset MLPI's purported Transaction A ldeficiencies against the Transaction C Royster-Clark residuals due to IFC under the Servicing and Residual Agreement. However, upon examining "clause Fourth of Section 11" on page seven of the Servicing and Residual Agreement, a highlighted copy of which is transmitted herewith, it is clear that the Servicing and Residual Agreement does not provide for an offset of deficiencies on Transaction A leases against Transaction C (Royster-Clark) residuals but rather only against Transaction B (Composite) residuals.

You also indicated that you did not believe that the Servicing and Residual Agreement provided for Illinois jurisdiction. Paragraph A on the first page of the Servicing and Residual Agreement dated as of December 30, 2004, expressly references it is "relating to and within the meaning of" the contemporaneous Master Sale and Assignment Agreement between IFC and MLPI entered into as of December 30, 2004. Paragraph A of the Servicing and Residual Agreement also specifically states that "All terms of the Master Sale and Assignment Agreement are incorporated herein." Paragraph 11.1 of the Master Sale and Assignment Agreement provides for exclusive Illinois jurisdiction for any legal action or proceedings relating to the agreement or any other document... Therefore, the Servicing and Residual Agreement includes that exclusive Illinois jurisdiction provision by its incorporation.

MEMBER


Equipment
Leasing
Association
of America

8700 Waukegan Road, Suite 100, Morto[...]663-6700 • Fax: (847) 663-6701



MEMBER of




Roger R. Marce, President
Manufacturers' Lease Plans, Inc.
October 4, 2007
Page Two

IFC, however, would prefer to avoid settling our disputes by litigation. In our telephone conversation of the other day, IFC agreed to suggest a settlement amount to you. Although your spreadsheet and calculations purportedly made pursuant to "clause Fourth - C of Section 11" shows that the cumulative total IFC is entitled to pursuant to the Servicing and Residual Agreement is $135,003.11, we have done our own calculation and determined that the amount is, instead, $135,414.40. See IFC's version of the MLPI-IFC Royster-Clark Sharing Agreement spreadsheet transmitted herewith.

Based on 100% of IFC's share the past due Royster-Clark payments to date which should be $27,408.34 for July – October, 2007 ($4,107 + $7,767.00 + $7,767.00 + $7,767.00 = $27,408.34) and IFC's share of the future payment due from Royster-Clark which should be $108,006.17 for November, 2007 – April, 2008, less a 10% present value discount on the future payments which would be $104,293.89, IFC is willing to accept a lump sum payment of $131,702.23 ($27,408.34 + $104,293.89 = $131,702.23) from MLPI now to fully and finally resolve the issue of the Royster-Clark payments now or, in the alternative, IFC would be willing to accept 100% of the amount Royster-Clark payments to date $27,408.34 for July – October, 2007, now and going forward regular, timely payments of IFC's share of the payments as received by MLPI from Royster-Clark.

Because there is no legal basis for MLPI to withhold any monies from IFC on Royster-Clark payments for any purported deficiencies that MLPI might have been sustained on any other, different lease accounts (such as Transaction A leases, for example) regardless of any of the alleged reasons for such, we hope you will give this offer serious consideration. This offer will expire by its own terms if not accepted by you within five (5) business days from today's date.

Sincerely,

IFC CREDIT CORPORATION

By: John R. Zinke Jr.
Attorney, Vice President – Legal Affairs

Encls.
cc: Beth Anne Alcantar, Esq., Robert Polonsky, and Patrick Witowski